*Ex Parte* JONES S. HAMILTON AND L. MIMS EUBANKS.

1. HABEAS CORPUS. *Trial as if by committing magistrate. Effect as to rights of parties.*

Where a person, arrested upon a bench warrant issued by a justice of the peace, and deprived of his liberty without investigation, on a charge of murder, petitions for a writ of *habeas corpus* which is accordingly issued, returned and tried as such, the character of the proceeding is not affected by the fact that the chancellor, at the hearing, may announce that he is examining the case as if a justice of the peace, and treats the parties as if the State were prosecutor and the relator the defendant; but it must be viewed as a *habeas corpus* proceeding with all the legal consequences thereof.

2. SAME. *Relator held on irregular proceeding. Duty of judge. Act of Feb. 16, 1884, construed.*

The second section of "an act to regulate the place of trial of writs of *habeas corpus*," approved Feb. 16, 1884, declares, "that, in the event the party in custody is entitled to his discharge by reason of any defect or irregularity in the proceedings for commitment, the chancellor or judge trying the case, if in his opinion the crime has been committed by the

party, may hold him over for further proceeding." This provision was not new, but merely declared pre-existing law. Every judge in this State, authorized to issue and try writs of *habeas corpus*, is, by the constitution and laws a conservator of the peace, and his plain duty was, before the enactment of this statute, to hold a party before him on *habeas corpus*, if the evidence showed such party guilty of some crime.

3. Same. *One writ made a bar to another.* § 2534, *Code* 1880, *constitutional.*

Sec. 2534 of the code of 1880 provides that, " the judgment rendered on the trial of any writ of *habeas corpus* shall be conclusive until reversed, and, whilst so in force, shall be a bar to another *habeas corpus* in the same cause, or to any other proceeding, to bring the same matter again in question, except by appeal, or by action for false imprisonment ; nor shall any person so discharged be afterwards confined for the same cause, except by a court of competent jurisdiction." This statute is not violative of sec. 3, art. 1, of the State Constitution, prohibiting the suspension of the writ of *habeas corpus.*

4. Same. *Section 2534, Code of 1880, construed.*

The effect of the statute above quoted, as restrictive of the rights of the individual, is to make the judgment rendered on the trial of a writ of *habeas corpus* conclusive until reversed, and a bar to another *habeas corpus* in the same cause, to bring the same matter again in question ; and, as protective of the rights of the individual, it shields him from being afterwards confined for the same cause by the order of any magistrate sitting as a committing court, and leaves him subject to confinement only " by a court of competent jurisdiction." *Ex parte Pattison*, 56 Miss. 161; *Ex parte Bridewell*, 57 Miss. 177; and *Ex parte Nichols*, 62 Miss. 158, examined, criticised and approved.

5. Same. *Bar of former judgment, how avoided.* § 2534, *Code* 1880.

The statute referred to precludes a prisoner who has been denied bail on *habeas corpus* from another writ to try the same questions involved in the first trial, or from the right to bail in the state of the case existing at the time of such trial. Newly-discovered evidence which, added to the evidence on the first trial, would vary the case, cannot avoid the bar of the former judgment. The only thing which can avoid such bar is some new state of case which, in and of itself, presents a ground for granting bail, without regard to and independent of the evidence on the first trial.

6. Same. *Bar, how affected by indictment of relator. Effect as to appeal.*

The subsequent indictment for murder of a person who, having been confined upon a charge of such offence, has been denied bail in a *habeas corpus* proceeding, does not make a new case entitling such person to another

writ of *habeas corpus*, nor subjecting his appeal from the judgment on the first writ to be dismissed by this court. And, if on the trial of such appeal the judgment be reversed, it is no longer a bar to another writ of *habeas corpus*.

7. SAME. *Question of change of venue.*

The propriety of a change of venue, ordered by the circuit court on the application of the district attorney, in the case of one indicted for murder, or the constitutionality of the statute authorizing such change of venue in certain circumstances, cannot be adjudicated upon on a writ of *habeas corpus*.

8. SAME. *Proceeding, how affected by relator's absence.*

The validity of a *habeas corpus* proceeding is not affected by the absence of the relator where he, being physically unable to attend, permits his counsel to present his case, without asserting his right to be present at the hearing, and the counsel endorse upon the writ an agreement that the relator "is technically in court."

APPEAL from the decision of HON. T. E. COOPER, Chief Justice of the Supreme Court, on *habeas corpus*.

On the 20th of August, 1887, a petition was presented to the Hon. A. G. Mayers, judge of the eighth judicial district, in the following language: "The petition of Jones S. Hamilton and L. Mims Eubanks respectfully states unto your Honor: "That, at the June term, 1887, of the circuit court for the first district of Hinds County, an indictment was presented by the Grand Jury of said Hinds County to said court, charging your petitioners with the murder of R. D. Gambrell, and upon said indictment a capias was issued to the sheriff of said county of Hinds, which was executed by the arrest of your petitioners, and under which said sheriff of Hinds County held your petitioners until delivered by him to the sheriff of Rankin County; that at said term of said Hinds County circuit court, upon application of the district attorney, a change of venue was ordered to said Rankin County, and thereupon a transcript of the record in said cause was filed with the circuit clerk of said Rankin County, and, by order of the circuit court of Rankin County, made at the August term, 1887, your petitioners were delivered by the sheriff of said Hinds County to the sheriff of said Rankin

County, and are now held in custody of the sheriff of said Rankin County under said indictment, without the permission to be enlarged upon bail. Your petitioners are illegally deprived of their liberty, without bail, in this: that the proof of the guilt of your petitioners is not evident, nor is the presumption great, nor is such proof evident or presumption great against either of them, and they are entitled to bail and to be enlarged upon the giving of the same. Your petitioners, therefore, pray your Honor that a writ of *habeas corpus* issue in their behalf, commanding them to be brought before your Honor, or some other judge, and upon a hearing that they be enlarged," etc. The petition was signed by the petitioners and verified by their affidavits.

Upon this petition a writ was issued commanding the sheriff of Rankin County to deliver the petitioners to the sheriff of Hinds County, and commanding the latter to have them before the Hon. T. E. Cooper, Chief Justice of the Supreme Court, on the 29th of August, 1887, "to do and receive what may then and there be considered concerning them." The two sheriffs made a joint return upon this writ, stating their performances of the order contained therein, and presenting a plea or answer setting forth "the causes of the commitment and detention of the prisoners."

The plea or answer referred to states that: "The said Hamilton and Eubanks are detained by virtue of an indictment presented by the Grand Jury of the First District of Hinds county to the Circuit Court of said district, the venue having been changed by the order of said circuit court; which said indictment is still in force pending a trial. Further, before the finding of said indictment, the said relators presented their respective petitions for *habeas corpus* to Hon. E. G. Peyton, Chancellor of the Ninth District of this State, having jurisdiction thereof (the petition of said Eubanks dated and presented May 16, 1887, and that of said Hamilton dated and presented June 7, 1887), in which petitions relators set up and charged that they were unlawfully detained and deprived of their liberty by S. B. Thomas, sheriff of Hinds county, who detained them on a charge of the murder of R. D. Gambrell, and prayed the

chancellor to inquire into the causes of their detention. Thereupon the said chancellor proceeded to hear the same, and after a hearing and argument *pro* and *con*, ordered and adjudged, on the 13th of June, 1887, that the applications be each denied, and the said prisoners remanded to the custody of said Thomas, sheriff, without bail; and from said order an appeal was prayed and granted, and amount of bond for appeal fixed. In obedience to said order and judgment said Thomas held said relators to await an indictment by the grand jury of said county and district. Thereafter, at the June, 1887, term of said court, said prisoners were jointly indicted for the said murder of R. D. Gambrell, and said prisoners are now held under said indictment and process thereon. The said judgments of the chancellor are unreversed and still in force. This application is in the same cause, and seeks to bring the same matters in question as were passed on by said chancellor. They file herewith copies of the said records in the *habeas corpus* proceedings, and of the said indictment, and ask that all of said records be made a part hereof, etc."

On the return-day of the writ, the 29th of August, 1887, Jones S. Hamilton presented to Chief Justice Cooper an amendment to his petition in the following language: "Your orator, Jones S. Hamilton, for an amendment to his petition for the writ of *habeas corpus*, respectfully shows that he is suffering greatly from a wound in his left arm, near the elbow, received in a conflict with R. D. Gambrell, which resulted in leaving in his elbow a leaden bullet, which rests against the elbow-joint and presses upon it; and it moves about the parts continually, causing great and constant pain, and rendering it impossible for him to straighten or rotate his arm without great pain, and threatening a permanent stiffening of his elbow-joint; and he is advised by his attending surgeons that it is important to extract it immediately; but they decline to perform the said operation while the relator is confined in jail; and relator says that such an operation in jail would be dangerous to his life; and this he sets up as an additional ground for his discharge on bail, and prays accordingly." This petition was verified by the affidavit of the relator.

On the same day the relators made a motion, to " strike out from the return to the writ so much of it as sets up the *habeas corpus* proceedings before Hon. E. G. Peyton, chancellor, previous to indictment found, and the judgment of said chancellor thereon, as surplusage and constituting no barrier to the application now pending." And on the 31st of August, 1887, this motion was overruled, and an exception taken by the relators.

On the day last mentioned, the district attorney representing the State made a motion "to strike out the amendment to the petition in this cause, which sets up the physical condition and suffering of relator Hamilton as a ground for bail; because the allegations of said amendment, if true, do not entitle relator to the relief sought to be obtained." On the 2d of September this motion was overruled.

On the 31st of August, 1887, Jones S. Hamilton, one of the relators, filed two replications to the plea or answer of the sheriffs, stating as follows : " 1. That on the 5th day of May, A. D. 1887, R. D. Gambrell was killed within the first district of Hinds county ; that on the 8th day of May, A. D. 1887, J. B. Gambrell made an affidavit before W. H. Harris, Justice of the Peace, charging respondents, W. H. Figures, J. W. Albrecht, L. M. Eubanks and Bill Hardy, jointly, with the murder of the said R. D. Gambrell, and praying for a bench warrant against them ; that the said warrant was thereupon issued by the said magistrate, and on the 9th day of May, 1887, all of said parties were arrested and imprisoned, except respondent, who was seriously wounded and taken into custody and guarded at his residence ; that thereafter, to wit : on the said 9th of May, 1887, the said Eubanks, Hardy, Albrecht and Figures sued out writs of *habeas corpus* before the Hon. E. G. Peyton, chancellor, upon their respective petitions, alleging that the said justice of the peace had announced his purpose to delay the preliminary examination to which they were entitled under the constitution and laws of this State, before their incarceration ; that the said writs of *habeas corpus* were issued returnable on the 16th day of May, 1887 ; that on the said 16th day of May, it was in and by agreement of counsel conceded that the said magistrate had unreasonably postponed the preliminary examination, and it was

65 Miss.—8.

agreed that the said chancellor might proceed to hear evidence
on the said petitions, and might remand to custody, admit to
bail or otherwise dispose of the cases as chancellor or conserva-
tor of the peace as the law and evidence might require; that
upon said agreement and the return to the said writ of *habeas
corpus* issued as aforesaid, and because of the said unreasonable
delay the said chancellor proceeded with the hearing of the
charge contained in the said affidavit of said Gambrell made as
aforesaid before the said magistrate, and heard the evidence *pro*
and *con* adduced; that, on the conclusion of the evidence, the
said relators, Eubanks, Hardy, Albrecht and Figures, moved the
court for leave to open and conclude the argument; but their
motion was resisted, the said chancellor adjudged and decided
that, in the case as presented, and the case of this respondent,
the writ of *habeas corpus* issued had accomplished its purpose
when the parties were brought into court, and the unreasonable
delay was admitted, and that thereafter, under the agreement
of counsel, he was proceeding in the cause as a conservator of
the peace. And for this reason, that the State was entitled to
the opening and conclusion of the argument; that the State took
advantage of the said judgment and adjudication, and did, in
fact, open and conclude the argument; that on the 7th day of
June, 1887, this respondent, who was at the time and had been
ever since the 5th, day of May, 1887, confined to his house and
wholly unable to leave it because of physical disability, pre-
sented to the said chancellor his petition for the writ of *habeas
corpus* in and by which he alleged that he was unlawfully de-
prived of his liberty by S. B. Thomas, sheriff of Hinds county,
by holding him in custody at his residence in the city of Jackson
in charge of a bailiff, under a mitimus of W. H. Harris, Justice
of the Peace, on a charge of murder of R. D. Gambrell, of which
he was entirely innocent, and praying the writ of *habeas corpus*
returnable at once; that the writ as prayed was ordered to be
and was issued; that the return to the said writ was in these
words: 'J. S. Hamilton is in my custody by virtue of the turning
over of a warrant by constable H. L. McGowan, said warrant
having been issued by W. H. Harris, a justice of the peace; and
he will be produced in court whenever this court shall so order.'

That when the said writ was issued, all the evidence in the several cases above mentioned had been taken in the absence of this respondent, and when he was confined at his residence, and was never in court before the said chancellor, and never had the opportunity of confronting any witnesses examined by and before the said chancellor; but that the chancellor at the hearing of respondent's said application, and upon the view thereof taken by him, considered all the evidence adduced on behalf of the said Eubanks, Albrecht, Figures and Hardy, and a stipulation in the agreement of counsel filed therein ; that ' said testimony * * * * may be used and read in evidence in the case of Jones S. Hamilton, charged with killing R. D. Gambrell, either in the committing court or on *habeas corpus*, with the right of either party to introduce any other, further or additional testimony ; ' that this respondent never did in any way waive the preliminary examination guaranteed to him by the constitution and laws of this State, and never did have such examination except that had before the said chancellor, all which he is ready to verify ; and so respondent says he has never had the benefit or advantage of the writ of *habeas corpus*, according to the true intent and meaning of the constitution and laws of this State."

" 2. And for further replication in this behalf, respondent says that the petition in the plea mentioned, so far as he is concerned, did not in fact state as charged in said plea.; but did state that he was unlawfully deprived of his liberty by the sheriff of Hinds county by holding him in custody by a mitimus of W. H. Harris, justice of the peace, on a charge of the murder of R. D. Gambrell; that no preliminary examination of said charge had ever been made by the said justice of the peace, nor did respondent ever waive such investigation ; that the said writ of *habeas corpus* was sued out by him in order to secure to respondent the said preliminary examination ; that on the return to the said writ, and in the absence of respondent, the Hon. E. G. Peyton, chancellor, etc., who issued the said writ of *habeas corpus*, considered the evidence adduced at the hearing of the writs issued in the cases of Albrecht, Figures, Eubanks and Hardy, and on the evidence adjudged that respondent was not

unlawfully detained, that the prayer of his petition be refused, and that he be remanded to the custody of the said sheriff without bail to answer the State of Mississippi on the said charge; that at the hearing the said chancellor, on motion of the district attorney, adjudged that he was considering the case as a conservator of the peace, and that the State had the right to open and conclude the argument, and that the counsel insisted upon the said right in the case as presented, and did take advantage thereof and exercise the same, all of which the respondent is ready to verify, etc."

L. Mims Eubanks filed two replications on the 31st of August, 1887, in the following language: 1. "And the said relator, L. Mims Eubanks, for replication to the plea of the sheriff in this behalf, says: That on the 5th day of May, A. D., 1887, Roderick D. Gambrell was killed within the first district of Hinds county; that on the 8th day of May, 1887, J. B. Gambrell made an affidavit before W. H. Harris, justice of the peace, charging these relators, W. H. Figures, Bill Hardy and J. W. Albrecht, jointly, with the murder of said R. D. Gambrell, and praying for a bench warrant against them, and the said warrant was thereupon issued by the said magistrate, and on the 9th day of May, 1887, all of the said parties were arrested under the warrant issued by the said magistrate as aforesaid, and all were committed except relator Hamilton, who was seriously wounded and held in custody at his residence; that thereupon to wit: on the day and year last aforesaid, relator and the said Bill Hardy were committed to jail by the said justice of the peace, under an injunction to the sheriff to keep them in separate cells, to await preliminary trial before him; and they were in fact, and without any preliminary examination incarcerated in the jail of the first district of Hinds county; that the said justice of the peace thereupon announced that he did not intend to investigate the said cause, but to delay the same, for reasons best known to himself, but not specially declared; that relator Eubanks tendered to the Hon. E. G. Peyton his application for the writ of *habeas corpus*, alleging that he was entirely innocent; that relator Hamilton would not be in a physical condition to undergo the fatigue of an examination for a month; that it was against

all reason and in violation of his constitutional rights that he should be held to await the chances of Hamilton's recovery before a preliminary investigation of his case should be had; that his arrest and imprisonment were the result of no well-founded suspicion of his guilt; and praying that the writ of *habeas corpus* issue, etc.; that upon said application, the writ of *habeas corpus* issued in fact, and relator Eubanks was brought before the said chancellor as directed; that on the 16th day of May, 1887, an argreement was entered into by and between the counsel for the State and relator, in words and figures following, to wit: in the above cases it is admitted and agreed on the part of the State that the magistrate, Harris, had unreasonably postponed the investigation as alleged in the petition, and that the case may now be proceeded with before the Hon. E. G. Peyton, chancellor of the ninth district of Miss., who is to hear all the evidence * * * and may remand to custody, admit to bail, and otherwise dispose of the case as chancellor and conservator of the peace as the law and evidence may requre, that in pursuance to said agreement, the said chancellor and conservator of the peace proceeded with the preliminary examination of the case, on and after the return to the writ of *habeas corpus*, upon and under the said application of the said J. B. Gambrell so made as aforesaid; that when, after the conclusion of the testimony, relator, through his counsel, moved the Hon. E. G. Peyton, chancellor, etc., for the privilege of opening and concluding the argument, to which he would have been entitled upon any *habeas corpus* proceeding regularly instituted as matter of right, under the constitution and laws of this State, that the said chancellor adjudged and decided that he was not sitting as chancellor in any manner to release the adjudication of a committing officer; that the writ of *habeas corpus* had served its purpose when the relator was brought into court, and it was conceded that the magistrate had been guilty of unreasonable delay in awarding to relator the preliminary proceeding provided by law; that thereafter he proceeded to act and did act and could only act as conservator of the peace under the statutes of this State, and adjudged that, in such case, the State was entitled to the opening and conclusion of the argument; that the State took

advantage of the said judgment and opinion of the said chancellor, and did in fact open and conclude the argument in relator's said case, and that respondent never has waived the right to have a preliminary examination before his incarceration. And this respondent is ready to verify, and so he says that he has not yet had the benefit or advantage of the writ of *habeas corpus* according to the true intent and meaning of the constitution and laws of this State, wherefore, etc."

"2. And for further replication in this behalf said respondent says that the petition in the plea mentioned, so far as he was concerned, did not state as charged in said plea, but on the contrary thereof; that the magistrate, W. H. Harris, before whom one J. B. Gambrell had made an affidavit charging respondent and others with the murder of R. D. Gambrell, announced his purpose, notwithstanding the arrest and imprisonment of respondent under the warrant issued by him and the demand of relator, not to have an investigation before he could investigate the case against the said Hamilton, jointly proceeded against with respondent; that respondent never had waived his right to a preliminary investigation; that by agreement of counsel it was conceded that the said magistrate had unreasonably postponed the preliminary investigation of respondent's said case; that the Hon. E. G. Peyton, chancellor, etc., before whom respondent sued out his writ of *habeas corpus*, upon the agreement of counsel conceding the said fact of unreasonable delay in making the said preliminary investigation, proceeded with the hearing, and ordered and adjudged, on the motion of the district attorney, that the State, in the case as stated in and by the agreement of counsel and arising in the cause, had the right to open and conclude the argument at the hearing; that the said counsel for the State availed themselves of the said adjudication of the said chancellor, and did open and conclude the argument in said *habeas corpus* proceeding. And that at the final hearing the said chancellor ordered and adjudged that respondent was not unlawfully detained, and refused the prayer of respondent's said petition in the said plea mentioned, and remanded respondent to the custody of the sheriff of Hinds county, without bail, to answer the State

of Mississippi on the said charge of murder, contained and setforth in the said affidavit of the said J. B. Gambrell. And this respondent is ready to verify by the record, etc., wherefore, etc."

And on the 31st of August, 1887, the relators, Hamilton and Eubanks, filed three joint replications in the following language:

" And the said relators, Hamilton and Eubanks, for their joint replication to the plea filed by the sheriff with his return to the writ of *habeas corpus* issued in their behalf, say : That at and before the time the indictment in this case was presented to be filed in the circuit court for the first district of Hinds county there was an intense popular excitement existing against these respondents, charged by the affidavit of J. B. Gambrell with the murder of R. D. Gambrell, in such manner and to such extent that at the June term, 1887, of the said circuit court, and after the case against these respondents was called for trial, the district attorney, on behalf of the State, applied and moved the said circuit court for a change of venue in respondent's said case, upon an affidavit made by him ' that by reason of undue prejudice in the public mind neither the State nor defendant could obtain a fair and impartial trial in the said first district of Hinds county ; ' that respondents objected to a change of venue, because the indictment was procured from a grand jury of the first district of Hinds county, with full knowledge on the part of prosecutor and district attorney of the existence of the popular prejudice complained of, and no steps were taken to examine the jury for favor, and because under the constitution and laws of the State the district attorney had no authority to move for a change of venue on behalf of the defendants ; that the said circuit court took proof, and thereupon entered an order to the effect that by reason of undue prejudice in the public mind neither the State nor the defendants can have a fair and impartial trial in the said first district, and, therefore, considered and ordered that the said motion of the State be granted and sustained, and that defendant's case be removed for trial to the county of Rankin ; which was accordingly done, all of which respondents are ready to verify by the records, and so these respondents say that, under and because of the proceedings

aforesaid, they have been deprived of the constitutional right to a speeedy trial in the said first district of Hinds county, in which the alleged offence was committed.''

" 2. And for further replication to the said plea of the said sheriff, respondents say that, presently after the killing of the said R. D. Gambrell, J. B. Gambrell, his father, made, before W. H. Harris, justice of the peace, his affidavit, charging these respondents and W. H. Figures, J. W. Albrecht, and Bill Hardy with the murder of his son; that these respondents were arrested, and the one incarcerated and the other kept in custody at his residence until he was confined in jail under the order of the chancellor in the plea mentioned; that ever since the eighth day of May, 1887, they have been imprisoned and wholly unable to prepare adequately for their defence; that they were compelled to rely upon ther friends to procure testimony in their behalf; that the prosecutor and his friends, aided by the popular prejudice against respondents, had access to witnesses, and actually summoned and put under the rule witnesses of the killing whose testimony was favorable to respondents, kept said witnesses under the rule, thereby preventing respondents' counsel and friends from having access to them, and after the trial discharged said witnesses without their having testified; that, pending the hearing of the *habeas corpus* proceedings, respondents endeavored to secure the attendance of one Thomas Hardy, a material witness in their behalf, who had failed to respond to the subpœna issued against him, and who, to avoid an attachment, left the State; that the State, on application of respondents, refused to allow proof as to what said Hardy would testify, and respondents were compelled to submit their case without his testimony upon the evidenc adduced before the chancellor; that since the hearing by and before the chancellor, respondents, by extraordinary diligence, have ascertained and found new and extremely important evidence in their behalf, of eyewitnesses of the killing, who will exonerate respondents from all blame touching the same, and who will fully and satisfactorily explain points of doubt and difficulty existing in the cause, and which, at the hearing before the said chancellor, it was important to explain or remove; that several of said witnesses have,

within the past two or three weeks, for the first time disclosed the knowledge they possessed, and that, by reason of the highly excited and prejudiced state of feeling existing in the said district and county adverse to respondents they until then withheld, and this respondents are ·ready to verify; where fore, etc."

3. "And the said relators, Hamilton and Eubanks, for further joint replication to the plea filed by the said sheriff with his return to the writ of *habeas corpus* issued in this behalf, say, that at the time the indictment was found against them as set out in said plea, there existed great popular excitement with reference to them, and the offence falsely alleged against them of a conspiracy to assassinate the said, R. D. Gambrell, and great popular prejudice; that this excitement and prejudice prevailed to such an extent and was of such degree as to warp and bias the minds of the grand jurors, and did warp and prejudice their minds against respondents; that the influence of the said excitement and prejudice was in divers ways and by divers means brought to bear upon the said grand jurors, pending the consideration by them of respondent's case; and did influence and affect their deliberations; and but for such excitement and influence the indictment in the plea mentioned would not have been found, and respondents say that they are not estopped in manner and form as set out in said plea, and this they are ready to verify; wherefore, etc."

On the 31st of August, 1887, the district attorney moved to strike out all of the foregoing replications on the grounds (1), that, " they present no sufficient reply to said return and plea;" (2), " they seek to contradict and contravene the record;" (3), " they seek to raise immaterial issues;" (4), " the questions sought to be raised have already been adjudicated adversely to relators upon their motion to strike out part of the return." And, as to the third joint replication, the motion stated the additional grounds, that, " it seeks to go behind the finding of the indictment and inquire into immaterial matters connected with such finding, and that it is a nullity." This motion was on the 1st of September, 1887, sustained and the replications stricken out, and the relators excepted. On the hearing and

argument of this motion, by consent, the record of the former *habeas corpus* proceedings of J. S. Hamilton, *ex parte*, and L. M. Eubanks, *ex parte*, before Chancellor Peyton were read and considered."

The agreement of counsel in the cases of Hamilton and Eubanks, respectively, before Chancellor Peyton, and referred to in their replications stricken out as above stated was as follows:

"In this cause it is admitted and agreed on the part of the State that the magistrate, W. H. Harris, had unreasonably postponed the investigation as alleged in the petition, and it is now agreed on behalf of both the petitioner and the State that the case may be now proceeded with before the Hon. E. G. Peyton, chancellor of the ninth district of Mississippi, who is to hear all the evidence on the petition for *habeas corpus*, and that he may remand to custody, admit to bail, or otherwise dispose of the case as chancellor and conservator of the peace as the law and evidence may require."

The opinion or ruling of Chancellor Peyton, referred to in the replications, was in the following language: "The effect of this writ of *habeas corpus* is to give the defendant a speedy preliminary investigation, a right which the committing justice denied. If the justice had not indefinitely postponed the hearing of the case, in violation of the constitutional right of the accused, but had heard it in time, the burden of proof would have been on the State. In granting the accused a speedy hearing, which the justice should have granted, they are not entitled to any greater rights than they would have had if the hearing had been before the justice of the peace. In other words: On this trial the chancellor stands in the place of the justice of the peace, as a conservator of the peace, investigating the charge against the accused. This charge against the prisoners is met by the presumption of their innocence, and the presumption must be overthrown by the State. The burden of proof is on the State, and it has the right to open and close the argument."

The record of the proceedings before Chancellor Peyton, read in this case, as above stated, shows that the return of the sheriff to the writ therein issued in behalf of Jones S. Hamilton was in these words:

" J. S. Hamilton is in my custody by virtue of the turning over of a warrant by Constable H. L. McGowan, said warrant having been issued by W. H. Harris, a justice of the peace, and he will be produced in court whenever this court shall so order." Upon the writ was an endorsement by Hamilton's counsel that " It is agreed that Jones S. Hamilton is technically in court." The return and endorsement bear date the same day.

On the 10th of September, 1887, the relators filed another joint replication in the following language :

" And for a further joint replication to the plea of the respondents to their petitions in this behalf, by leave of the presiding judge first had and obtained, relators say : That they ought not to be barred and precluded of a full investigation herein by reason of the judgment and order of remand in the said plea mentioned for this : *That relators never waived the preliminary examination required by law*, and that the examination before the said Peyton was begun, considered and concluded on the application of relator Eubanks, who was, with relator Hamilton, J. W. Albrecht, W. H. Figures and Bill Hardy, charged with the killing of R. D. Gambrell, on an affidavit made by J. B. Gambrell, before one W. H. Harris, justice of the peace of Hinds county ; that upon said investigation the State's evidence was directed to the establishment of a conspiracy between relator Hamilton and the other accused to murder R. D. Gambrell ; and the evidence of the defendants to show that the encounter was solely between relator Hamilton and the deceased, and in that encounter the deceased fired the first shot, and was the aggressor ; that during the whole of said investigation relator Hamilton was at his residence, in custody, disabled by wounds inflicted by said R. D. Gambrell, and defendant relied wholly upon his friends to collect evidence in the case, and relator Eubanks imprisoned, except when in court during the investigation,—all of which foregoing facts were known to the counsel representing the State in the prosecution; that since the said examination before the Honorable E. G. Peyton, Chancellor, etc., and judgment of remand made by him, relators have discovered evidence material to their defence, and tending to establish their innocence ; that in fact said evidence is not

cumulative, and so much as is cumulative is corroborative of facts deposed to by witnesses whose testimony was contradicted by the witnesses for the State; that relators did not know of the existence of•said witnesses nor of their testimony until too late to be of any service to them; that said newly discovered evidence is that of two witnesses who were eye-witnesses of the affray in which said R. D. Gambrell was killed; that neither the relator nor his counsel had at the time of said investigation any information of the knowledge had by the said witnesses of the killing, and the absence of such information is not due to the lack of diligence in that regard; that said two witnesses would have testified, and will testify, to material facts, which, with the other evidence in the cause, would have established, and will establish, the innocence of relators of the crime charged against them, and would have wholly disproved the State's contention of a conspiracy; the said two witnesses were summoned for the State on said investigation before the said Chancellor Peyton, at the instance of counsel representing the prosecution, and placed under the rule as witnesses; that before and after they were put under the rule as aforesaid they were interviewed by counsel for the State, and informed said counsel of their knowledge of facts connected with the killing of said Gambrell; that when the said witnesses were put under the rule they were cautioned by the Chancellor not to speak of the case or their testimony, and one of them was told afterwards by one of said counsel not to talk to any one; that after they were put under the rule the said witnesses were interviewed by counsel for the State, and informed said counsel of what they knew; that one of said witnesses was cautioned by the bailiff of the court not to speak to any one about the case or the testimony thereon; that the said witnesses were kept under the rule some four or five days after their knowledge of the facts of the case had been communicated to counsel for the State; that they were not examined as witnesses before the said chancellor, nor were they tendered to the relators' counsel for examination; and that when they were discharged they were not informed that such discharge removed the injunction of secrecy which had been imposed upon them."

" And these respondents further say that they were prevented from obtaining the testimony of the witnesses by the said action of the said attorneys for the prosecution, and thereby they were greatly injured in this—that they were deprived of testimony that would have demonstrated their innocence in connection with the other evidence before the chancellor; that during the examination before the said chancellor three friends of relators Hamilton and Eubanks, W. H. Gibbs, Jack Williams and James Hill, and upon whom they relied to collect and ascertain evidence in their behalf, and who actually so employed were without cause or reason summoned by the State as witnesses in behalf of the State and put under the rule, thereby to keep them from acting for relators; that they were kept from talking to the other witnesses, and not allowed to go into the court room when the trial was proceeding, to keep them from being cognizant of the evidence then being taken, and from conversing with persons, so as to ascertain the real facts of the case, and the district attorney so stated to one of the said parties; that there was general intimidation of every kind brought to bear upon the friends of relators who were actually endeavoring to secure eye witnesses of the transaction, all the evidence in the case of a direct character, by threats to summons and put them under the rule; and this was carried to such an extent that those who were cognizant of the actual facts were advised by those not directly interested not to talk, and they did not talk about the case or divulge what they knew; that the testimony relied on by the State against these relators was almost if not entirely circumstantial, beyond the declaration made by relator Hamilton, that the deceased had shot him while he was in his carriage on his way home, and he had gotten out of it and killed him."

On the 15th of September, 1887, by leave of the Chief Justice, the following addition was filed to the replication last recited: "And these respondents further say, by way of amendment to their replication herein filed, on the tenth day of September, 1877, that on the night of May 5th, 1887, one Charles Farish was at Blake corner, on Pearl street, about three hundred yards from the iron bridge, when the shooting between J. S.

Hamilton and R. D. Gambrell occurred; that he heard two small pistol reports and then a louder report; that he remained at the place above stated until the firing ceased; that he then walked to the government building, a distance of about one hundred yards, and saw Col. Hamilton's red wagon and white horse harnessed to it; that the said Farish was subpœnaed and put under the rule as a witness for the State during the trial before Chancellor Peyton in the plea mentioned, and was kept under the rule five days; that the said Farish then asked the district attorney, R. N. Miller, to discharge him, and then and there told said district attorney what he knew of the case; that said district attorney then and there told him he need not go back into the room, but that he was not discharged from the rule; that said Farish was never told by any of the counsel for the prosecution that he was discharged from the rule until he was called by the deputy clerk to get his witness certificate, and was not called or examined as a witness for the State. And these respondents further say that the testimony was of the most material character in this: During the trial before the said Chancellor Peyton the testimony for the State tended to show that the pistol had by R. D. Gambrell at the time of the encounter was a Smith & Wesson 38 calibre, and that by replicant Hamilton a 45 calibre army Colt, the reports from the latter being much louder than those from the former; and that the first shot heard by sundry witnesses for the State was a loud report, and immediately following that a cry of murder; while the testimony for the defence tended to show that the first two shots were small reports, and the third a loud report; and had the State put the said Farish on the stand a great deal of weight would have been placed upon his testimony. And these respondents did not know of the existence of the said Farish, nor of the evidence he would have given on the said hearing before the said chancellor, until sometime after the judgment of remand rendered against them by the said chancellor. And this they are ready to verify. Wherefore," etc.

To the replication and amendment just recited the following rejoinder was filed:

"And now comes the district attorney, who represents the

State, and for rejoinder to the joint replication of the relators this day filed, says:

"*While of the opinion that the allegations of the said replication are insufficient and present immaterial issues, yet inasmuch as that portion of the replication which refers to the suppression by counsel for the State of evidence claimed to have been discovered by relators is relied on to show that by the wilful conduct of said counsel, testimony material to the defence, was kept from being given into the court, or from being known to relators, and inasmuch as this allegation reflects upon counsel for the State, and if true ought to be known in justice and fairness,* the State now joins issue on that portion of said replication having reference to the conduct of the State's counsel for suppressing testimony or preventing its being known to relators, and denies the allegations in this regard, and prays the court to inquire into the same."

"As to all other allegations in said replication, the State says that they are insufficient in law and present immaterial issues, and raise matters of defence already adjudicated by this court on this hearing on other pleas of relators, and adjudicated adversely to relators; and as to these only the State declines to join issue, but asks that they be stricken out."

Counsel for relators moved to strike from the files this rejoinder to their replication: "Because it does not take issue either in fact or law to the whole of said replication, but seeks to demur to a part of it and take issue upon a part, which is not proper pleading." Thereupon, the chief justice, of his "own motion ordered stricken from the said replication" the following italicised words therein: "That relators never waived the preliminary examination required by law." The relators excepted. And the chief justice ordered, of his own motion, that the rejoinder to such replication "be purged of impertinent matter by striking therefrom that paragraph (above italicised) commencing 'While of the opinion,' and ending 'justice and fairness.'"

The testimony of many witnesses was adduced, both by the relators and by the State, on the issue presented by the replication of Sept. 10, 1887, as amended, and the rejoinder thereto, and for and against the amendment to Hamilton's petition seek-

ing bail because of the condition of his wounds.    The effect of that evidence, as viewed by this court, is indicated in their opinion herein.

The bill of exceptions recites that : " At the conclusion of the said testimony, the relators, Hamilton and Eubanks, by their attorneys, moved the court to re-open the whole cause and inquire into the issue propounded by the original petition for the writ of *habeas corpus*, notwithstanding the plea to the return of the sheriff of the prior adjudication ; or, if the court should be of the opinion that the evidence taken to sustain their joint replication of September 10, 1887, and the amendments thereto, was not sufficient, that relator Hamilton be admitted to bail upon the ground alleged in his separate petition, as to the necessity of extracting the bullet from his arm, and the danger to life or limb that would attend the operation in jail, as set out in said petition ; but the court overruled the said motion and remanded the relators to the custody of the sheriff of Hinds county, whence they were taken; and the relators excepted," etc.

On the 20th of September, 1887, the chief justice made a final order, stating that " the court was of the opinion that, under the evidence submitted, the prayer of the relators for bail should be denied ;" and that : " It further appearing to the court, from the evidence submitted in support of the amended petition of relator Jones S. Hamilton, that he should be removed from the jail in the city of Jackson, where he is at present confined, in order that the operation necessary for the removal of the bullet from his arm may be performed with better sanitary surroundings, the court was of the opinion that it was proper that he should order said relator temporarily to the Yazoo county jail, and offered to order such removal; but the relator J. S. Hamilton having in open court, through his attorneys, declined to accept this relief, the court doth order, adjudge and decree that said relators J. S. Hamilton and L. M. Eubanks be, and they are hereby remanded to the custody of S. B. Thomas, sheriff of Hinds county, Mississippi, without bail." The relator Hamilton objected to the incorporation " in the final judgment against him of an offer to him to order his removal to the jail of Yazoo county, and confinement there for the purpose of re-

moval of the bullet from his arm, and his refusal of this offer; and excepted to the action of the presiding judge in so incorporating said offer and his refusal of it."

From the final decision of the chief justice, the relators appealed to this court.

*Nugent & McWillie*, for the appellants.

1.   The relators Hamilton and Eubanks *never had and never waived* the preliminaay examination required by the laws of the State, unless the proceeding before Chancellor Peyton be so construed.   Counsel for relators claimed in that case the opening and concluding of the argument on the ground that it was a purely civil proceeding on their petitions; but the Chancellor did not so consider and declared that: "The effect of this writ of *habeas corpus* is to give the defendants a speedy preliminary investigation, a right which the committing justice denied.   On this trial the Chancellor stands *in the place of the Justice of the Peace, as a conservator of the peace*, investigating the charge against the accused."   If the proceeding is to be considered as a *habeas corpus* proceeding proper, the conclusion reached was as this, and other courts have adjudged.   Church on Habeas Corpus, § 141; *Ex parte* Lange, 18 Wall., 163; *Ex parte* Tom Tong, 108 U. S., 556; *Ex parte* Cota, 110 U. S., 385.

If the proceeding before the Chancellor was not, in contemplation of law and under the agreement of counsel, a preliminary investigation it was nothing.   If it was, then there can be found no good reason, in our opinion, for denying the present writ; if it was not, then the relators have been deprived of a valuable constitutional right to their prejudice, without any waiver on their part or any intention to waive it, and the same result must follow.   The relators moved to strike the plea annexed to the answer of the sheriff's out, as presenting an immaterial issue, or demurred to it, and this raises the first question in the cause.   This plea is based on Sec. 2534 of the Code of 1880. This Code section has undergone several discussions before by this court, and had its meaning fixed as applicable to the cases examined.   See *Ex parte* Pattison, 56 Miss., 163; *Ex parte* Bridewell, 57 Miss., 177; *Ex parte* Nichols, 62 Miss., 158.

In Pattison's case it is said that the failure of the jury to

agree gives *jurisdiction to entertain a new application*, and in
Nichols' case the reason is alleged to be because it may thereon
be plausibly argued that the legal presumption growing out of
an indictment has been negatived.    It is quite manifest that the
reason given is of no force ; the ground is that the failure of the
jury to agree is a *subsequently occuring event which delays the
speedy trial guaranteed by the constitution, and for which the
prisoner was held, and gives jurisdiction to inquire into the fact
as to whether the proof is evident or the presumption great.*  Any
other view would prove futile, for the discovery of new evidence
before concealed might furnish a  more  than " plausible "  argu-
ment that the indictment found was groundless ; and  the  actual
appearance in life of the *supposed dead man* has been held suffi-
cient to give the court jurisdiction to entertain the writ and
grant bail even when by statute the finding of an indictment is
conclusive of proof evident or presumption great.    The reason
given for the rule will not, therefore, do.    The court below inter-
preted the expression in the  Nichols case—" whereby the legal
aspect of the case is changed "—to be applicable only when the
indictment is for an offence less than that for which the accused
was held, or when being held to answer for *murder* he is in-
dicted for *manslaughter*.    But, as in such case, the sheriff or
court would bail on motion *as matter of course*, the construction
given to the decision of this court would seem to be very much
strained.    The new writ must be based on facts which have
*actually occurred since the hearing of the original writ* ; but what
kind of facts ? and by what rule are they measured in favor of
the liberty of the citizen ?   A case has been stated above—the
appearance in life of the person supposed to have been killed ;
another of mistaken identity could be given ; and, a third, when
the accused, having been held on purely circumstantial evidence
before indictment and upon *habeas corpus* proceedings, the *eye
witnesses* of the killing, before concealed, have appeared and ex-
pressed a willingness to testify.    The last is the case at bar.    It
cannot be pretended that in the first two cases the writ should
not go ; it would be a mockery of justice to suggest the idea; it
would be a travesty upon judicial propriety to argue in this
direction as if an animal were in controversy.

An illustration is found in the case of *People* v. *Tinder*, 19 Cal. 539, and *People* v. *Cole*, 6 Park. Cr. 695. In California the finding of an indictment creates " great presumption " of guilt; and while, as a rule, an application will not be allowed for bail in such case, " the existence, at the time the indictment was found, of great popular excitement with reference to the prisoner, or the offence charged against him, likely to bias and warp the judgment of the grand jurors ; the existence of the party charged to have been murdered ; or a clear confession by another of the commission of the offense for which the defendant is indicted," have been held *as special and extraordinary circumstances entitling the accused to bail or an application for bail*; in other words such circumstances so occuring are sufficient to rebut the legal presumption and allow the hearing of evidence.  *People* v. *Smith*, 1 Cal. 9.  The adjudication in the one case by a grand jury under statute is no greater than in the other.  The existence of the person said to have been killed was an *old fact* existing just as much before as after; his actual appearance in life was the *subsequently occurring* fact.  So it may be said an eye witness of a killing is an *old fact*, but the disclosure of his *knowledge of the facts* is a *subsequently occurring fact.*  We can see no difference, and respectfully suggest that the decisions of the court, as heretofore construed, should be made to harmonize with the humanity of the law and the declaration of the bill of rights.

In the Bridewell case the change of circumstances occasioned by the finding of an indictment resulted in depriving the relator of the decision in his favor, and was said to be *new matter* arising out of a *new condition of things.*  On the first hearing, and, by express agreement of counsel, the chancellor sat *as a conservator of the peace, and not otherwise.*  The parties so understood the matter, so understood the proceeding, and were advised and *so intended when the writ was sued out.*  The whole case went upon the inquiry as to whether the prisoner should be held to await the action of the grand jury, and the chancellor *adjudicated " only that and nothing more."*  The force of his judgment was thus spent; the true text of his adjudication must be this: Would a reversal of the chancellor's opinion and

judgment entitle the relators to bail here? Bridewell's case answers the proposition in the negative. It is said, however, that we must displace it *to pave the way for a new application.* We would not be entitled to bail " because of the different condition of things," even if there was a reversal; and if the different condition of things exists so as to cut us off from the full benefit of an appeal and reversal, it must, from the necessity of the case, entitle us to a new writ. Otherwise, the privilege of the writ is flagrantly suspended. If the judgment of reversal would not estop the State from asserting its right to our detention, surely the judgment itself of the lower court ought not to estop us from a new proceeding. We, therefore, think the court below erred in allowing the plea as a defence to the writ. The very question here involved has recently been decided in *Witmore* v. *Burgan,* 30 N. W. Rep. 391. The result of the chancellor's decision only would debar us from another like proceeding before indictment. This court will not do a vain thing, to reverse for no purpose the original case. 60 M. 790.

As to Hamilton, the plea was of no force. The chancellor could not lawfully have proceeded to dispose of his case because his body was never produced in court. The only way to gain jurisdiction of the person was by *having the defendant before the court* in the manner required by law, and the court not having so gained such jurisdiction its proceedings were void as to Hamilton at least. Its judgment was *coram non judice.* *Reynolds* v. *Orvis,* 7 Cow. 269; *People* v. *Liscomb,* 60 N. Y. 559; *People* v. *Cavanagh,* 2 Park Cr. 650; *Deckard* v. *State,* 38 Md. 186; *Brenan* v. *Gallan,* 2 Cox. C. C. 193; *Ex parte* v. *Siebold,* 100 U. S. 371; Code 1880, Sections 2528, 2529, 2537.

But there is another reason why the judgment of the chancellor should not be held to be conclusive. The constitution delares that " the *privilege* of the writ of *habeas corpus* shall not be suspended unless when, in case of rebellion or invasion, the public safety may require." What is the legal effect of this constitutional provision? It will be noted that the phrase is " the *privilege* of the writ of *habeas corpus,*" not the writ itself. We understand this clause in the bill of rights *to be addressed* to the legislature, and to be intended to circumscribe legislative

discretion in dealing with the great writ of personal liberty. The suspension of a privilege, so far as an act of the legislature is concerned, is an act by which a party is deprived of *the exercise of the peculiar constitutional privilege for a term.* Bouvier Law Dic. *Verbum.*

The legislature might regulate the exercise of the great privilege; it could not curtail or suspend it in any manner except in the cases stated. What are the limits to legislative discretion? See *Ex parte Watkins*, 3 Peters, 193; *People* v. *Liscomb*, 19 Am. R. 215; 60 N. Y. 559.

2. The first joint replication of the relators counts upon the facts that the circuit court ordered the change of venue against their objections as a deprivation of their constitutional right to a speedy trial in the first district of Hinds County, and a full answer to the plea herein. If we are correct in the proposition of law announced, the plea was of no force. *Ex parte Caples*, 58 Miss. 358.

Code Section 3067 provides that " the State may procure a change of venue by order of the court, upon proof of what the prisoner must show to obtain the change, and the same proceedings shall be had about the order for a change in the one case as are required in the other." We presume that the statute was passed in pursuance of Section 4, General Provision, Constitution, Code p. 35. The Section reads thus : " The legislature shall provide by law for the *indictment and trial* of persons charged with the commission of any felony, in any *county* other than that in which the offence was committed, whenever owing to prejudice, or any other cause, an impartial grand or petit jury cannot be empanneled in the *county* in which the offence was committed." Section 7, of the bill of rights, provides that " in all prosecutions by indictment or information, a speedy and public trial, by an impartial jury of the county where the offence was committed " shall be had by the accused. Code Section 3061 which provides for a change of venue on the application of the accused.follows the language of the constitution. The condition of the application is the inability to secure a fair trial in the *county*, and not in any part of a county. But the fourth section of General Provision clause of the Constitution could only give the State the right to

change the venue where *an indictment* could not be found against one accused of a crime. When an *impartial grand jury* has been obtained and an indictment secured, the State can take no steps for a change of venue. The Code, Section 3067, could not, therefore, be constitutional, in the view we take of this case and as applied to it.

3. The points presented against the conclusiveness of the judgment by the second and third joint replications may be briefly stated thus:

(1) That Hamilton was never before the court at all, being in custody at his house during the whole proceeding.

(2) That Eubanks was incarcerated, except while in the court, and he and Hamilton were compelled to rely upon their friends for testimony.

(3) That aided by the popular prejudice against respondents the prosecution had access to witnesses, and actually summoned them and put them under the rule, kept them under the rule and did not examine them; and that these witnesses of the killing would have exonerated defendants.

(4) That Hardy, a material witness for the defence, left the State to escape service of an attachment, and relators were forced to go to hearing without him.

(5) That the indictment was unlawfully obtained because of and by the popular excitement brought to bear upon the grand jury.

If the decision of *People* v. *Tinder, supra,* is of controlling authority, the case ought to have been heard anew. If the finding of the indictment is to be no after-occurring fact, but constitutes an additional reason against us, it is met by the replication as to how it was procured. But the escape from the State of one of our witnesses, it would seem, should entitle us to a new hearing.

The question arising on the pleadings and evidence as to the conduct of the prosecution is fully and fairly presented. It was never intended to charge them with the use of dishonorable means to accomplish the desired end, nor with the fraudulent suppression of evidence. The inquiry is whether the counsel for the State was under a duty to put on the stand and examine

all witnesses summoned, or tender them to the defence for that purpose. If such was their duty, and they failed in discharging it, and the matter has recently, and after the hearing, come to the knowledge of the defence, a case is presented which we think ought to entitle us to a new hearing, and that was the only object sought to be accomplished. On this point we refer the court to the following authorities, though we admit that, on a trial before a jury, the rules announced might be different. *Rush* v. *Cavanaugh*, 2 Penn. St. 187; *Meriter* v. *People*, 31 Mich. 99; *Curtis* v. *State*, C. Cold. 9.

4. By leave of court relator Hamilton presented an amendment to his petition in which he alleged the necessity of an operation to extract the bullet from his arm, and the danger to his life if the operation was done in the jail at this place. The sufficiency of this petition was tested on a motion to strike out, proof was taken, and at the hearing the judge held that the operation could not safely be performed in the jail, but was of the opinion it might safely be done in the jail at Yazoo City, and offered the relator this privilege, which was not availed of. If the petition was proven as to the jail here, our contention is that Hamilton ought to have been bailed at once, as there was no issue as to the condition of other jails in the State.

5. Having acquired the jurisdiction under the new writ the court should have gone into the full investigation of the case on the motion of the relator, and admitted the newly discovered evidence tendered. See 6 *McLean*, 360; 1 *Wheeler's* Crim. Cases, 326.

*Calhoon & Green*, on the same side.

The judge below was manifestly wrong, as we respectfully insist in holding that the case before judge Peyton was *res judicata*. It certainly was not *res judicata*, unless it was a *habeas corpus* trial. Now we take the position that Judge Peyton tried it as a conservator of the peace, by the solemn agreement of the parties, and according to his own written opinion as it appears in the record. And we take the further position that he could not have been trying the case on *habeas corpus* unless there was a special agreement that he should be so trying it, and we exceedingly doubt, under the facts in this case, whether such

agreement would have given him jurisdiction to try in any other capacity than that of a conservator of the peace.

The agreement of counsel, as it appears in the record, was that the office of the writ of *habeas corpus* had been fully performed. That writ was based upon a petition averring that the parties were illegally confined in jail, on the specific ground that the justice of the peace, instead of conforming to the law, on the affidavit of Mr. Gambrell that they had committed murder, which law required him to have the parties brought before him for investigation into the probable cause, violated the law by issuing a warrant .to the sheriff, pursuant to that affidavit, commanding him to seize the parties, not bring them before him for preliminary investigation, but absolutely to confine them in jail, in separate cells, and that the justice of the peace was barring them of that preliminary investigation to which the petitioners were entitled under the constitutional laws of the State of Mississippi. They were bound, and by right therefore were, to have that preliminary investigation; and accordingly, as the record shows, counsel entered into a formal agreement to the effect, that as a matter of fact petitioners were illegally delayed of this preliminary investigation. As soon as this agreement was made, of course the writ of *habeas corpus* had accomplished its functions and was no more, and entitled the accused to a discharge, but for the Act of 1884. Under the agreement of counsel of record it is seen not that the parties should be tried as upon *habeas corpus*, but that the case should be proceeded with by the chancellor " as chancellor and conservator of the peace," and that as such chancellor and conservator of the peace he should investigate *not the complaint of the defendants in their writ of habeas corpus*, but the " *charge* " against defendants. This now is the solemn agreement of counsel that the chancellor should investigate the " charge " and not the complaints of defendants in their writ of *habeas corpus*. It seems to us that if the agreement can accomplish anything, this, in itself, states the question, that the chancellor thenceforth was not considering the *complaint* of defendants in their petition of *habeas corpus*, but the " charge " made against them by the State of Mississippi, and these functions were confined in the agreement to the inves-

tigation of the question of probable cause, as a committing magistrate.

We assume that this court will not hold that if the agreement was, that Chancellor Peyton should investigate as a committing magistrate, that nevertheless, under that agreement, he could sit only to determine the question on *habeas corpus;* to hold this would be to permit a judge to exercise one jurisdiction on the pleadings, and another by his rulings, when the effect of such exercise in each case was different.

Superadd to this, that the Chancellor himself, under this agreement, thought he was sitting, not on *habeas corpus,* but as a conservator of the peace, by his own express ruling, in writing, in the record, we say that even if he might possibly under the law have been sitting as tryer of the *habeas corpus* writ, notwithstanding his judgment of the jurisdiction he was exercising and notwithstanding the agreement of counsel, the court will not hold that he was, for the reason that it would work an outrageous injustice upon the defendants, to apply the same rules to the judgment in a case, where the Chancellor thought he was sitting *only* as a conservator of the peace, and thought he was *only* considering the question of probable cause, that would be applied to a case where he thought he was sitting, and was acting and rendering judgment as a judge upon *habeas corpus.*

*W. P. Harris,* on the same side.

The act of 1884 changes the posture of the prisoner from that of an actor to that of a defendant, and changes the character of the proceeding in case of the invalidity of the proceedings for commitment. It does not direct that the judge shall proceed to hear evidence or to examine the charge or to commit the prisoner, or to hold him to bail or to remand him. If he proceeds at all it is not under the writ of *habeas corpus,* and in response to the prayer of the prisoner, or at his instance. It is manifest that the further proceeding is to be *in inivitum,* and by the public authority and on the adjudged fact that no valid proceedings against the party had ever taken place. The requirements of the law of criminal procedure §§ 3112, 3113, 3114, have not been fulfilled. If under the code the party was discharged for the invalidy of the preliminary proceedings, further

proceedings on the charge would be original proceedings as directed by the law of procedure; and being held over for further proceeding by the act of 1884 in default of any valid proceedings under the law of procedure, what is the character of that further proceeding for which the party is held over under the act?   Clearly it is the provisional action required to secure commitment for trial, and not a proceeding under the writ of *habeas corpus.* It is a proceeding for commitment which had been omitted or abused, and thus rendered void.   It is original in its nature.

It is not material whether this original proceeding to supply the place of the abortive or void proceedings, is to be conducted by a justice of the peace, the regularly appointed officer, or by the judge who has by the writ of *habeas corpus* obtained control of the person of the offender.   It is not a proceeding at the instance of the prisoner, and must therefore be by the public authority and against the prisoner to secure his appearance for trial.   But there is ground to believe that it was not intended that the judge was to proceed ; and certainly not to proceed under the writ.   Is it to be supposed that the legislature intended merely to say that there should be hereafter no distinction between valid proceedings for commitment and void proceedings ?  If so, the language in which such intention would be expressed is so obvious that the omission to employ it shows that such was not the intention.   If the distinction between valid and invalid proceedings was to be disregarded by the judge, the act would have said, that in case it shall appear that the proceedings for commitment are invalid, the judge shall notwithstanding proceed as in other cases to hear evidence and discharge, let to bail, or remand.

There is an example to be found in the Wisconsin statute prescribing the duty of the officer before whom the *habeas corpus* is returned.   Code, Wis., p. 908 ; chap. 158, sec. 21.

In the one statute the judge is directed to proceed as in other cases on *habeas corpus*, without regard to the void proceedings, and to bail or *remand*.   In the other the judge is told to hold the party only.   If it was necessary to press the point further, that the judge is not to proceed at all ; but to detain for rightful pro-

ceedings to supervene, it would be sufficient to cite the unanimous opinion of this court in *Luckett* v. *The State*, 51 Miss. 799, that the judge trying a case on *habeas corpus* cannot convert himself into a committing magistrate, and cannot exercise the powers of a conservator of the peace.

The state of the law on the inquiry in respect to the effect of subsequent changes wrought by the action of the grand jury and Circuit Court, after the case of *Bridewell* v. *The State* has become part of the body of it, is such as to admonish us that proceedings anterior to the time when that court takes cognizance of the case must be regarded as being displaced by the supervention of a power which can rightfully disregard them. In that case the court held that a decision on *habeas corpus* granting bail was not conclusive on the State after indictment, and that the State might show cause against the decision by proof. It is difficult to see why the decision, if against bail, should be held conclusive, after the event of action by the grand jury and Circuit Court, against the prisoner. This does not appear to be fair, at all events not reciprocal. It is clear that under our decisions the finding of an indictment for a capital offence is deemed to be perfectly compatible with a right to bail; and, indeed, the indictment in practice is held to be of no greater force than a legal commitment, on the question of bail. Both put the burden of showing cause on the accused, and nothing more.

*L. W. Magruder*, on the same side:

The proposition that the decree of Chancellor Peyton is, under the statute, a bar to a second writ, notwithstanding the indictment is based upon the idea that such finding puts no new phase upon the case nor changes its status.

The State admits that the doctrine in Bridewell's case is right, where, before indictment, bail had been granted. The principle invoked for the distinction proceeds on the idea that the supervening fact to warrant a new writ, as the finding of an indictment or the disagreement of a petit jury, must posses the quality in some way of impairing the force or correctness of the former decree.

This can be the only principle or reason upon which the

distinction can be maintained; indeed, it is the only reason advanced, but it is manifestly fallacious.

What, then, is the meaning of the statute denying more than one writ for "same matter" in "same case"?

In Bridewell's case it is said, after indictment, it is not the same matter; that a new phase of the case was presented. Was it a new phase because Bridewell had been allowed bail? Most certainly not. It was because a court of competent, original, and plenary jurisdiction had acquired jurisdiction. It was because the *status of the case* had been changed. The question as to whether, before then, he was entitled to bail ceased to have any status. The power of a chancellor to adjudicate his enlargement and so decree, terminated at once, upon finding of the indictment. It was no longer *res judicata*, not because of any legal force in it as displacing the adjudication; but because it was a " *new phase*," a new step, which terminated the authority of the decree, and was the acquisition of a plenary and superior jurisdiction which could disregard former adjudications.

It is because he " may be confined again for the same cause by a court of competent jurisdiction."

In other words, the function of an order allowing or denying bail, terminates with the indictment, which is the authority of a court of competent jurisdiction to confine again for the same cause.

This would seem to be the true meaning of the statute, and a solution of the difficulty of harmonizing the so-called " *res judicata* " of such an order with the finding of an indictment.

This construction would make reciprocal the right to a second writ, after indictment, whether bail had been before given or denied.

It avoids the absurdity of placing the reason, why indictment after bail granted, is a new case upon the ground that the indictment imported legal presumption of error in granting bail, and therefore displaced it as *res judicata.*

There is another aspect of this view of the statute which seems perfectly conclusive of the case.

It is now perfectly clear that the appeal from Chancellor Peyton cannot now be heard by the court upon the right to bail. That right cannot now be granted on appeal. The court will

not do a vain thing.  If Chancellor Peyton had granted, or ought to have granted bail, that right ceased with the indictment.  The court will not hear and adjudicate a theoretical right once existing, but since expired.

There is another result absolutely inevitable, and conclusive of error, in Judge Cooper's decision.  It is this :  As it is plain that Judge Peyton's decision cannot be reviewed, on appeal, as that right has gone, the effect of Judge Cooper's decision is, unquestionably, to deprive appellants of the right of appeal and review of the question of bail upon its merits, on the appeal from Judge Peyton, and, therefore, if Judge Cooper is right the appellant is cut off entirely from an appeal upon the merits, unless the appeal be heard, not to determine the question of bail presented by the appeal, but to determine if the chancellor was right, or wrong, and so whether it is *res judicata* or not, and whether appellant may have another writ if he likes, and this most irrational outcome and conclusion will also be avoided, upon the just and obvious construction of the effect of the indictment, and of the statute for which I have contended.

*W. L. Nugent* and *W. P. Harris*, of counsel for the appellants, argued the case orally.

*T. M. Miller*, Attorney-General, for the State.

It is insisted for appellants (1) that the chancellor sat merely in his capacity of conservator of the peace; that no appeal lay from the decision, and hence his judgment concluded nothing ; (2) as to Hamilton, that his body was never actually produced before the chancellor in the first proceeding, and therefore that the judgment was *coram non judice*—assuming jurisdiction of the subject matter.

1. In support of the first proposition no authority is cited, except the opinion of the chancellor and that of relator's counsel.

It is believed there is nothing in the idea that the chancellor obtained jurisdiction by reason of the delay in the magistrate to proceed with the preliminary examination to which relators were entitled ; that thereupon the writ was *functus officio*, and thereafter the court, sitting as chancellor, stood adjourned, and in the further stages of the cause sat clothed with only the functions of a justice of the peace.

It is true that the duties he had to perform in order to determine the right were the same, to wit: To inquire whether the defendants should be held with or without bail; but there is no warrant in the statute for the idea that if he refused the right asserted in the petition no appeal would lie; nor is there any warrant for the idea that he would sit in any other capacity than chancellor. His powers and duties were prescribed by the statute when he obtained jurisdiction at all, and the agreement of counsel was unnecessary. It neither imparted power nor detracted from it.

It is admitted that if a prosecution or examination is begun originally before a chancellor, then he would sit merely as a conservator of the peace. But when the writ of *habeas corpus* (the writ of liberty) is resorted to he has full jurisdiction necessarily to determine the right.

This is true, because the proceeding is authorized to be brought before him as a court. It is a civil remedy, allowed for the assertion and obtention of a personal right. The object of the suit is not merely to obtain an examination, but, as the statement and prayer of the petition shows, to secure the enlargement of the petitioner. That is the ultimate right asserted; that is the object and purpose of the suit. The court being empowered to grant this relief, then whatever determines the right is involved in the proceeding, and an appeal without the limitation insisted on here, is provided for.

Here the attention of the court is called to the fact that before Chancellor Peyton the petition of the relator, Hamilton, was general; the want of a preliminary examination, as a ground for the writ, was not stated.

2. The second proposition, that the court was without jurisdiction because the body of Hamilton was not produced in court before the chancellor, is without support in reason or authority, so far as I am able to find. The provision of the code, that the defendant shall produce the body of the relator, is designed for his benefit, if he insist on being brought in before the trial proceeds, and the circumstances admit of it. I presume he has the right. The proceeding being a civil remedy, he may waive the right to be present, and may proceed by counsel.

Church on *Habeas Corpus*, sections 70, 163.

3. Appellant's third proposition is that the judgment of Peyton, chancellor, could not operate as a bar to this writ, because subsequently an indictment was found against the relators on the charge of murder of R. D. Gambrell.

The question for trial under the writ is this : Is the proof evident or presumption great of a capital offence ? If, after indictment for murder, a second writ is sued out, then necessarily the attempt is to try the same matter over. This is precisely what is forbidden by the statute. If the negative is the condition of the proof, the applicant would be entitled to bail whether before or after indictment. Both the warrant of the magistrate, and the capias under the indictment, are steps toward bringing the offender to trial upon the same charge. The question is (so far as the right to bail is concerned) the same in both cases— is one of guilt ; clear proof of guilt.

The indictment is nothing more than additional cause for holding the party already adjudged to be properly in custody. It may present a new matter against him ; but surely it is not a new matter in his favor, as would have been the case had it been for a lesser crime.

In this view no fault can be found with the decision in Bridewell's case. To the former commitment was superadded a solemn charge preferred by a grand jury upon sworn evidence.

When, as was said in Pattison's case, the new writ must be based upon *facts* which have actually occurred since the hearing of the original writ, it must be intended : *facts* that cast a doubt upon the original judgment—the disagreement of a pettit jury, for instance—and not facts that tend to add strength to it, such as the finding of an indictment against the relator. It is submitted that the opinion in *Ex parte* Bridewell is to be taken with reference to the facts before the court.

4. That the discovery of new evidence does not make a new case we are content to rely upon the adjudication of this court.

5. It is urged that since an indictment has been found a reversal of the chancellor's opinion would not entitle the relators to a discharge. That in fact the appeal could not be entertained, therefore a second writ must be allowable. But if we are right

in the position that the question of guilt or innocence, as affecting the right of bail on the charge of murder, was the matter tried in the *habeas corpus* proceeding, then it is not material whether the relators are held under a mittimus from a magistrate or a capias upon an indictment. The "matter" is the same and so long as the judgment remains unreversed, by the very terms of the statute, it must bar the same inquiry.

A court of competent jurisdiction has decided that the proof is evident or the presumption great. An appeal from that judgment is provided for, and why may it not be reversed and displaced if erroneous. True, the finding of the indictment *might* make it improper for this court to admit to bail in the event of a reversal of the chancellor's decision, and suggest the propriety of remanding for an examination in view of the changed aspect *against* the appellants; but the judgment that the case was not bailable, as it stood, would be displaced so that a new writ might be prosecuted, or, under the first a further inquiry had.

6. The notion that an act of the legislature denying the right to a second writ of *habeas corpus* in the same case—on the same matter—is unconstitutional is a notion only. There is nothing in it.

Judge Nelson's opinion in the Krine case (3 Black)—cited by council—maintains no such proposition. He only held that in the absence of legislation by congress the common law controls the federal courts in *habeas corpus* proceedings. Therefore, one writ did not bar another.

No such question is considered in the case of Tobias Watkins in 3 Peters. While in Tweed's case the court merely held that where the power of the court was exhausted under the law the defendant was entitled to be discharged under a writ of *habeas corpus*.

The privilege of the writ of *habeas corpus* is not denied under our statute. On the contrary, the writ is not only allowed; but an appeal to the highest tribunal of the State which ought, it seems to us, to be considered ample compensation for the common law right to pursue every judge in the realm.

7. There can be no force in the idea that a change of venue

on the State's application deprived the relators of their right to a speedy trial. It is not permitted in *habeas corpus* proceedings to inquire into the propriety of the ruling of a court of competent jurisdiction. If error is committed, the remedy is by appeal. *People* v. *Cavanagh* 2 Park. Cr. Rep. 650.

But the constitution expressly provides for the removal of criminal cases upon the application of the State.

8. There was no fraud in the failure of the State's representatives to examine witnesses whom they had summoned before the Chancellor and placed under the rule. The issue upon this point seems only to have been joined for the purpose of allowing counsel to vindicate themselves.

9. It is insisted that inasmuch as no issue was joined on so much of Hamilton's petition as showed the necessity of a surgical operation on his person, and the unsuitableness of the jail, that was to be taken as true, and the Court had no right to allow an inquiry touching the condition of neighboring jails. But the question for the court (sitting in an administrative as well as judicial capacity) to determine is whether the relator should be discharged on bail, and the inquiry therefore was proper.

10. To hold that a court acquiring jurisdiction of a second writ on account of some new matter being *stated* entitles the relator to go into the whole case, or to introduce new evidence of "old facts," would be to destroy the principle of *res judicata* provided by statute, and restore the old mischief intended to be cut off by it.

*Brame & Alexander*, on the same side.

There was no error in overruling the motion of relators to strike out the portion of the plea which set up the judgment before Chancellor Peyton as a bar.

It is conceded that under § 2543, Code 1880, the judgment of the former case is a bar unless some new fact or event has transpired that alters the substantial aspect of the case.

Does the subsequent finding of an indictment make this new case and entitle in a case like this to a new hearing?

The section cited has been three times construed by the Supreme Court. In *Ex parte* Pattison, 56 Miss., 161; *Ex parte* Bridewell, 57 Miss., 177; *Ex parte* Nichols, 62 Miss., 158.

All these cases were relied on both by the State and the relators, and thus a new construction of the statute is called for.

Our conclusion from these cases is that, with the single exception of ill health which is an independent ground not only for an application and jurisdiction, but, if proved, for bail, the other "new matters" are those which either throw light on the question of guilt or innocence or such as operate to deprive of a speedy trial,—a constitutional right.

The language in *Pattison's case*, that " either sufficed to give jurisdiction and to demand an investigation," clearly means an "investigation" of the *new matter*, not necessarily an investigation of the whole case.   In that case there had been no investigation even into the new matter, as Judge Chrisman *dismissed* the second application. If the mere *allegation* of *new matter* gave jurisdiction, then a prisoner could always get another hearing, and any number of hearings, by simple unproven allegations in his petition, and this whether the allegations were true or false.

Relator's counsel claim that if they are estopped by the former judgment if adverse, the State ought to be if it had been in their favor.   That estoppels should be mutual and reciprocal. To this we say that it is not governed by the common law principle of estoppel.   It is a *statutory bar*.

We reply with this query: If relators had been given bail by Judge Peyton and had afterwards *taken sick,* would the State have been entitled to rearrest claiming "new matter;" or, if bail had been given and then a mistrial had ensued, would the bar of the judgment in the first case be destroyed so that a rearrest would be proper?   These questions were propounded by the Chief Justice to counsel for relators in the lower court, and "they were speechless."

Character in which Chancellor Peyton sat.

Appellants in the trial before Judge Cooper for the first time (so far as any one knows) raised the point that Judge Peyton sat as *conservator* of the peace, as a mere committing officer.

The jurisdiction of a chancellor on hearing of *habeas corpus* is stated in § 2530, Code.   The agreement is in the exact language of the said statute.   The statute was before us and was

copied into the agreement to obviate all possible objection to the jurisdiction.

We admit that after the jurisdiction attached Judge Peyton sat as a committing officer.   So does every judge on *habeas corpus* under § 2530, and especially under the act of 1884, p. 75.

Presence of Hamilton on the former trial. .

Relator Hamilton contends that the judgment of Judge Peyton was void because he was not present during the trial. To this we answer briefly :

1.   This objection could only be raised by appeal.

2.   This is a collateral proceeding and not revisory.

3.   It appears from the record that he was present in the jurisdiction of the court.

4.   If his presence was necessary because it was a criminal proceeding, the objection was waived by not being made in that court.   Code § 1433.

5.   It does not affirmatively appear that he was absent at any time.

6.   Counsel for Hamilton waived his presence.

7.   *Habeas corpus* is a civil proceeding.   Church on *Habeas Corpus*, p. 66, § 70; 108 U. S., 556; 57 Iowa, 386.

*Habeas corpus* not a review or appeal proceeding.   *Ex parte* Phillips, 57 Miss., 357; *ex parte* Cottrell 59 Cal., 420; *Boykin* v. *Cook* 61 Ala., 473.

Counsel for appellants insists that they are entitled to maintain this application, because since the judgment of Judge Peyton an indictment has been found and now a reversal would not avail them to get bail.   To this we reply :

It does not appear that the appeal from Judge Peyton's judgment stands in any different light from other appeals in *habeas corpus* cases, where the application and appeal is before the indictment. The statute is plain that the judgment is a bar until reversed. The great majority of cases of applications in *habeas corpus* are before indictment found; and relators by their appeal, which they delay to perfect until after the indictment, must be content with such relief as the law provides in such cases.

Neither under the statute nor under the constitution have they a right to more.   The former judgment is a bar *until*

*reversed.* If reversed it opens the way for a new application; and this is what relators seek to obtain. So we deny that a reversal in the former case, if secured, will be of no avail.

The chief justice found properly against relators, on the plea as to fraud in the procurement of the judgment before Judge Peyton, and also as to the alleged physical suffering of relator Hamilton.

It was not necessary to have joined issue formally on the amended petition. It is the duty of the officer to bring in the prisoner and show the written authority, if any, for holding him. Section 2528, Code.

The application is *ex parte* and the burden is on relator whether there be any defence or not.

It is the duty of the trial judge not to try on the pleadings as in chancery suits proper; but under section 2530, when the prisoner is brought, " to immediately proceed to inquire into the cause," etc., and act " as the *law and the evidence* shall require;" not as the *pleadings* may require.

The chief justice properly held that Hamilton was entitled to only temporary relief. This relief was clearly in his power to give, and was in the scope of the relief sought. We refer to sections 345; 3052, 3053, 3054 Code; Church on *Habeas Corpus,* 175.

*T. M. Miller,* Attorney General, and *C. H. Alexander,* for the State, argued the case orally.

CAMPBELL, J., delivered the opinion of the Court.

The trial before Chancellor Peyton was the trial of a writ of *habeas corpus.* Had the judgment been in favor of the prisoners it would have been conclusive in their favor according to the statute, and it must, as against them, have its full effect as a judgment rendered on the trial of a writ of *habeas corpus.* It is true that Chancellor Peyton, by consent of all concerned, might have sat as a substitute for the justice of the peace, and then his judgment would have had no greater effect than one by the justice of the peace would have had; but the record of the proceeding must govern, and it shows that the writ of *habeas corpus* was petitioned for, and issued and returned and tried as such,

and the fact that the chancellor announced that he was examining the case as if he was a justice of the peace does not change the aspect of the case as made by the record.

The second section of " An act to regulate the place of trial of writs of *habeas corpus*," approved February 16, 1884, Acts, p. 75, made no change in the law as it existed before.    Every judge in. this State authorized to issue and try writs of *habeas corpus*, is, by the constitution and laws, a conservator of the peace, and his plain duty was, before the act of 1884, to hold the party before him on *habeas corpus*, if the evidence showed the party guilty of some crime, however defective or irregular the proceedings for his commitment may have been ; and the time never was in this State when any judge, with an intelligent comprehension of his position and duty, would discharge a party in such case.    Where, on *habeas corpus*, the view of the judge is restricted to an inspection of the process by which the person is held, if that is so defective as not to authorize his detention, the only judgment is a discharge ; but where the whole evidence is heard, as in this State, a judge who before the act of 1884 would have discharged from custody on trial of a writ of *habeas corpus* one shown by evidence before him to be guilty of some crime, would have erred and deserved censure.

The second section of the act of 1884 was merely declarative of pre-existing law.

Section 2543 of the Code is constitutional.    It antedates the constitution, and has been the law of this State since 1822. The constitutions of 1832 and 1869 were adopted with reference to it, and no provision of the constitution is inconsistent with it.    The declaration in the Bill of Rights against suspension of the writ of *habeas corpus* is not in the remotest degree inharmonious with the statute, which does not suspend the privilege of the writ in any way.    The whole purpose of the statute is to declare the effect of a judgment on the trial of a writ of *habeas corpus* as a bar to another writ in the same cause to bring the same matter in question, and as a protection to the person discharged against further confinement for the same cause, except by a court of competent jurisdiction.    But for the statute the judgment for or against the person on the trial of the writ of

*habeas corpus* would not be final. It could not be appealed from. If it was for the petitioner it would not protect him against another arrest and further confinement. If it was against him he could not correct an error by appealing, but could sue out another writ before the same or another judge who might follow the first decision, and he could get no redress unless he could find a judge who would discharge him; and when thus discharged he might again be immediately arrested on new proceedings before any justice of the peace, and be again confined in the face of the former discharge. To remedy this evil this statute was passed. It makes the judgment rendered on the trial of a writ of *habeas corpus* conclusive until reversed, and a bar to another *habeas corpus* in the same cause to bring the same matter again in question. This is a restriction of the right of the individual. He alone could have another writ of *habeas corpus* or appeal from the judgment or have an action for false imprisonment.

All of § 2534, except the last part, relates to the effect of the judgment as against the prisoner, and declares its effect as a bar to proceeding by him. The last part of the section declares the effect of such judgment in his favor as a protection to him against being afterwards confined for the same cause. So now, by virtue of the statute, the judgment on the trial of a writ of *habeas corpus* is conclusive until reversed, (and provision is made for an appeal by the individual decided against) and bars the person decided against from having another writ of *habeas corpus* in the same cause to bring the same matter again in question, and a judgment in favor of the party shields him from being afterwards confined for the same cause by the order of any magistrate sitting as a committing court. The bar of the judgment against the prisoner operates throughout the cause to prevent the same matter from being again brought in question at his instance. The judgment against him on the trial of the first writ is continuously and perpetually throughout the same cause conclusive against him as a bar to another writ to contest the same matter involved in the first trial. The bar in favor of the prisoner discharged on the first trial is operative in his favor to protect him from being afterwards con-

fined for the same cause, except by a court of competent juris-
diction.    The English statute and the statutes of some of the
American States in order to prevent vexation by reiterated com-
mitments for the same offence, provide that one delivered upon
*habeas corpus* shall not again be imprisoned for the same offence
except by the court having jurisdiction of the cause.    Our stat-
ute has exactly this meaning, and secures immunity from im-
prisonment for the same cause, except by the proper court before
which the cause is brought.    These views have been heretofore
announced by this court in *ex parte* Pattison, 56 Miss., 161;
*ex parte* Bridewell, 57 Miss., 177, and *ex parte* Nichols, 62 Miss.,
158, and are adhered to after careful re-examination of the whole
question.

Newly discovered evidence, which, added to the evidence on
the first trial, would vary the case cannot avoid the bar of the
former judgment.    If some decisive fact, in itself conclusive of
the innocence of the prisoner without regard to the evidence in
the first trial (such as the person charged to have been killed
being produced on the like) would avoid the bar of the first
judgment, it is sufficient to say that is not the case before us.
The evidence offered here was of the sort which it was claimed
would, when considered in connection with that taken on the
first trial, show the prisoners to be entitled to bail.    In this case
the evidence given on the first trial was preserved, but in many
cases and probably in most the evidence heard by the judge is
not written down or preserved, and even if a bill of exceptions
is signed, that is for the appellate court only.    How then is the
second writ of *habeas corpus* to be tried?    If, before the same
judge who tried the first, is he to rely on memory for the evi-
dence?    If before another judge, what then?    Are the witnesses
first heard to be again produced, or shall their testimony as given
on the first trial be proved by those who heard it?    Shall the
discovery of a new witness necessitate a new investigation to
ascertain if the old and the new together show the case to be
bailable?

To so hold would nullify the statute.    It denies to the
prisoner denied bail on *habeas corpus* another writ to try the
same question involved in the first trial, *i. e.*, the right to bail in

the then existing state of his case. The nature of the proceeding precludes the adoption of the rule applicable to new trials for newly discovered evidence, and vindicates the conclusion at which we have arrived. That the statute makes the judgment conclusive until reversed is indisputable. There is no precedent for avoiding the bar of a judgment when set up by questioning its correctness and producing evidence to show that a different judgment should have been given. It was never heard that evidence could be produced in such case for such purpose. The only way known to avoid the bar of a judgment is to show it to be void or that it did not embrace the matter involved.

In this case the effort to show the former judgment void for fraud was abortive, and indeed counsel for the appellants disclaim any charge of fraud in obtaining the judgment.

The former judgment did embrace the matter involved in the new writ, viz.; The right to bail on the state of facts existing when the first writ was tried.

The propriety of the change of venue cannot be determined in this proceeding. If the law authorizing it was to be declared unconstitutional, that would not affect the question of granting bail; but we would not be understood as suggesting a doubt of the constitutionality of the statute on that subject.

There is nothing in the complaint that Hamilton was not before the chancellor.

It is not true, as argued by counsel, that the subsequent indictment of the parties for murder made a new case so as to entitle them to another writ of *habeas corpus*, and so as to cause their appeal from the judgment against them on the first writ to be dismissed by this court. As held in *Ex parte Bridewell, supra*, the bar against them continues after indictment throughout the cause, so as to prevent the right to bail on the state of facts existing when the judgment was given. Their appeal from that judgment will not be dismissed because of the indictment, but will be heard; and if the judgment shall be reversed, it will be thereby vacated, and no longer a bar to another writ of *habeas corpus*.

In Bridewell's case it was claimed that the judgment granting him bail was conclusive in his favor of the right to bail after

indictment; but this court held that it was not; that its protec-
tive force in his favor ended when the court of competent juris-
diction took charge of him.   The former judgment was. in his
favor, but was not conclusive after indictment for murder,
because the conclusiveness of a judgment in such a *habeas cor-
pus* trial depends wholly on the statute, and it makes the judg-
ment in favor of the prisoner conclusive only until he shall be
dealt with by a court of competent jurisdiction.

In citing the cases above mentioned, we would not be un-
derstood to approve all of the language of the opinions.   Each
case was undoubtedly decided right.   But the language of the
opinions might have been more happily chosen, as we are now
·convinced by the thorough revision to which our investigation
of this case has led.   We are especially dissatisfied with the
announcement in *Ex parte Patterson*, that a mistrial will furnish
ground for a new writ and the production of new testimony,
·and the remark about giving jurisdiction is not accurate.   It is
not a question of jurisdiction, but of the conclusiveness of the
former judgment as a bar.   We are satisfied that the only thing
which can avoid the bar is some new state of case which in and
·of itself presents a ground for granting bail, without regard to
·and independent of the testimony on the first trial.   The cir-
·cumstance of a mistrial might be influential on hearing, but can-
not of itself be held to avoid the bar.   In no case can the testi-
mony on the first trial be looked to as a factor in the second.
It has no place in the second trial.  ·

The language of the opinion in *Ex parte Bridewell* might
well have been more specific; but, applied to the case before the
·court, cannot be misunderstood.


ARNOLD, J., concurring.

I concur in the opinion just read, and on the main issue in-
volved say that Section 2534 of the Code declares that " the
judgment rendered on the trial of any writ of *habeas corpus*
shall be conclusive until reversed, and while so in force shall be
a bar to another *habeas corpus* in the same cause, or to any
other proceedings to bring the same matter again in question,
·except by appeal or by action for false imprisonment; nor shall

any person so discharged be afterwards confined for the same cause, except by a court of competent jurisdiction."

The effect of this statute is to make the judgment on a writ of *habeas corpus* a bar against another writ based on facts which were, or might properly have been, investigated on the trial in which the judgment was rendered. *Ex parte* Nichols, 62 Miss. 158; *Ex parte* Bridewell, 57 *id.* 177; *Ex parte* Pattison, 56 *id.* 161. All matters of fact which existed, and which were or might have been litigated on such trial, would be concluded by the judgment; but matters of fact. arising after the rendition of the judgment, such as unusual and oppressive delay in the prosecution, or serious injury to the prisoner's health likely to prove fatal on account of confinement, might be investigated on another writ; for they were not and could not have been examined on the first writ, and to investigate them on another writ would not be the trial of the same cause, or the bringing of the same matter in question again. New evidence as to old facts, or facts which existed at the time of the trial on the first writ, would not be sufficient to avoid the bar of the judgment on the first writ, or to authorize the issuance of another writ in the same cause. The utmost extent to which the jurisdiction of another writ could be carried would be to consider the case of the applicant as made by facts which have actually happened since the trial on the first writ. This must be the general rule; but if the extreme cases suggested in the argument of counsel should ever occur, such as indisputable proof discovered after judgment. denying bail on *habeas corpus*, of the party alleged to have been killed by the prisoner being alive, I apprehend that this court or any court would consider them so exceptional as to avoid the bar of the judgment denying bail, and warrant the issuance of another writ and a new investigation.

I .do not understand the language employed in *ex parte Pattison*, 56 Miss. 161, in reference to the effect under the statute of a mistrial on the rights of a prisoner as to *habeas corpus*, to mean more than that a mistrial by a petit jury, after judgments denying bail would be one fact, which in connection with others occurring after the judgment, would be sufficient to entitle the prisoner to a second writ and another investigation

on such new facts; but such new investigation would not, and could not, bring into consideration or rehearing facts heard or existing when the judgment was rendered. If more was intended to be said, it seems to me incorrect and misleading. A judgment or *habeas corpus* operates for and against the prisoner, only to the extent and in the manner allowed by the statute. If it is in his favor and he is discharged, with or without bail, he may be re-arrested or imprisoned for the same cause, when indicted therefor, or by a court of competent jurisdiction, for the statute provides that this may be done. If it is against him and he is denied bail, appeal is his only remedy, for the statute gives no other to bring the same matter in question again. It is impossible, under the statute, to give a judgment on *habeas corpus* such reciprocal operation for and against the prisoner that if he is denied bail before indictment and is afterwards indicted, he may then annul the judgment against him by another examination of the question of his guilt or innocence, upon a new writ. Without regard to the statute, the fact of the indictment being found in such instances would not change the legal aspects of the case in his favor, but rather against him.

At common law an adverse judgment on *habeas corpus* was no bar to another writ; and a subject deprived of his liberty might resort in turn to every judge of the realm, and be discharged or bailed by either one of them who thought proper to do so; notwithstanding each of the other judges may have decided to the contrary. This was the evil sought to be remedied by Section 2534 of the Code. The statute is a positive restriction on the rights of a prisoner in regard to *habeas corpus*, as they existed at common law. It makes the judgment rendered on the trial of any writ of *habeas corpus* conclusive; and a bar to another writ in the same cause, to bring the same matter in question again, how long? The statute answers until reversed on appeal. Another provision of the Code changes the common law again, by making judgments on *habeas corpus* reviewable by appeal, and confers the right, without restriction except as to the State, of appeal to the supreme court, on any party aggrieved by such judgments. To permit the bar of a judgment on *habeas corpus* to be escaped by newly discovered

evidence generally, or such as would be sufficient for a new trial at law, or for a bill of review in chancery, would nullify the statute and foster the very evils it was intended to remedy.

The last clause of Section 2534 of the Code applies exclusively to the case where a person has been discharged on *habeas corpus*, and forbids that he shall be again arrested or confined for the same cause, until he is indicted or proceeded against therefor by a court of competent jurisdiction. When this clause of the statute is put in operation by the action of the State, and a person who has been discharged on *habeas corpus*, with or without bail, is afterwards indicted and rearrested and confined for the same offence, it is a just and necessary construction of the statute that he should not be denied another writ, and a new investigation on the merits, without reference to whether the facts on either side are new or old. He could not be barred by the former judgment, superseded by the action of the State in his rearrest and confinement, for that judgment was in his favor, and could not be pleaded in bar against him. The right to another writ in such cases was recognized and not disputed in *ex parte Bridewell*, 57 Miss., 177.

In case at bar, the judgment denying appellants bail on their first proceeding by *habeas corpus* is a bar against them until reversed by appeal, except upon facts which have occurred since that judgment was rendered, and his Honor, the Chief Justice, did not err in refusing to hear testimony given on the first trial, or which was in existence at that time, and I am unable to say that the newly occurring facts in evidence before him were sufficient to justify or require the relief prayed for.

I vote to affirm the judgment, because I do not find in the record sufficient proof of facts arising subsequently to the judgment on the first writ to avoid the bar of that judgment.